## Joiner v. Commonwealth.

October 25, 1949.

G. D. Milliken, Jr. and Joe S. Garman for appellant.

A. E. Funk, Attorney General, and Walter C. Herdman, Assistant Attorney General, for appellee.

JUDGE HELM—Affirming.

The appellant, Pauline Joiner, was charged with the murder of John Blaney. The jury found her guilty of voluntary manslaughter and fixed her punishment at five years in prison. She appeals from the judgment entered on that verdict.

Appellant lived with her husband about one and one-half miles from Bowling Green in a small two-room house, with a front and a back door, near the Glen Lily road. About 10 o'clock on the night of June 17, 1947, appellant and her husband awakened Vick Smith, Jailer of Warren County, who lived on the Glen Lily road some 400 yards beyond the Joiner property. The husband in the presence of his wife, advised the jailer that his wife, Pauline, had killed John Blaney, and said, "I want to turn her over to you, she wants to give herself up." Smith took her into custody and went at once to the Joiner home.

Smith found John Blaney on the outside of the house, near the front door, with his feet under the edge

of the house and his head away from the house. Blaney was dead. Smith opened the front door and examined the front room. He found a shotgun lying across the foot of the bed, the barrel pointing toward the door. One shell had been fired from the gun; the other hammer was pulled back. He found a small rock on the inside of the house, between the door and the window. Smith found that the lower part of the upper panel of the door was out. He found a part of the panel in the room. The part was about two inches wide and extended about halfway across the door. The piece of panel found on the inside had been broken from the outside. He found a round gunshot hole about the size of a half-dollar through the door, five or six inches above the door knob. The hole was around 32 to 36 inches from the bottom of the door. He found blood on the door, just above the broken panel. Smith put appellant in jail, called the coroner, Chester Basham, and together they went back to the Joiner home.

Basham found the body of Blaney lying on the ground, right in front of the door of the house. The body had not been moved; Blaney was dead; the top of his head "was blown off;" his death was caused from "shotgun wounds." As he recalls, about a four inch strip of the door panel was out; "there was a gunshot hole near the door knob." On cross-examination, he was asked: "From your investigation of the body and from the hole in the door, would you tell this jury whether or not the shot that killed John Blaney came through the hole in the door?" Basham answered: "Yes."

Jennie Blaney, mother of John, lived about a quarter of a mile from the Joiner home. She stated that appellant had married Joiner in March, 1947. Appellant had worked at the Blaney home for more than a year before she was married. On Sunday, before John was killed on Tuesday, appellant came up the road "hollering and singing" and cursing; she had been drinking; she said she had come after some clothes. Mrs. Blaney went to the cupboard where the clothes were kept; appellant jumped up and got behind the cupboard door, waved her hands and said she didn't want the clothes. Mrs. Blaney told her to go home. John was sitting out at the end of the walk on a rock.

Pauline "went out to where John Henry was sitting. John Henry didn't get up and make no move towards going with her and she said, 'You had better go with me now or I bet I never see you again.' And he just sit there and he never did make no move to go with her." On the day John was killed, he and appellant went across the field towards Meador's whiskey store. There appeared to be no trouble between them at that time.

Fred Blaney, brother of John, says that he had seen his brother and appellant together frequently. When asked if they were friendly or unfriendly, he said, "They were in arms * * * in love." At the time his brother was going with Pauline she was "married to Joiner." Henry Moore had seen Pauline and John walking together in Bowling Green a number of times. He had never seen them "fussing or quarreling, * * * They seemed to be walking along kinder like sweethearts to me." John Meeks saw Pauline and John together about 5 p.m. the day John was killed. They were walking along together and seemed to be friendly.

About 6:30 p.m. of the evening John was killed, Mrs. Blaney saw him at the Joiner home. She went there to tell him his supper was ready. As she went toward the house she saw Pauline come to the front door and look up and down the lane like she was looking for someone. When Mrs. Blaney got down where she could be seen, Pauline came out and said "'You know, mamma, I didn't have no business to come over there.'" John was "laying across the bed * * * in the front room." When Mrs. Blaney asked John to go home with her, Pauline "put both arms around him and held him." John said, "'I will be home, mamma, in forty-five minutes'"; Pauline said, "'Yes, you will if I will let you,' and she threw her arms around him and just held him there." This was the last time his mother saw him alive. John was 22 years of age, single, a small man—about five feet five or six—and weighed around 108 pounds.

At the trial, appellant was asked to tell the jury what Blaney was doing at the time she fired the shotgun. She answered, "Well, he was throwing rocks at the door and cursing me and telling me he was going to kill me, was coming in after me." When asked to tell what

she did in regard to the shotgun, she stated, "Well, I was busy in the kitchen and I was scared too and I went and got the shotgun and loaded it when he said he was going to come on in, you know, and he had done knocked the panel off the door and then he went off some place and then I laid the gun down across the bed and went on back to work and in a few minutes he come back and began throwing rocks again and I took this gun and I told him I was going to shoot and shot out the door." This was about 9 p. m. Asked when she found out that she had shot Blaney, she said, "I kept calling him and he didn't answer and well, a good while after I got the lamp lit * * * I went to the door and I saw him laying out there." She then went to a neighbor's telephone and called her husband, who was working for the Pet Milk Company. Asked if she intended to kill Blaney, she answered, "No, I thought it would scare him. * * * I didn't know where he was. It was dark outside, I couldn't see."

On cross-examination she said she did not know where John was at the time she shot, "He had been right there at the door and had been hitting the door and so I knew he was out that way, but I didn't know just where he was. * * * He left several times and came back." She did not go outside to see if the rocks had hit the door or dented it. When she fired the shotgun, the lamp which she had brought from the kitchen went out. She said, "I shot the gun through the door because I knew he was coming in. * * * The door was thumb-bolted." When asked why she called him after she had shot, she said, "I thought maybe I did kill him." When asked if she was afraid of John, she answered, "He had threatened me a lot of times." Asked as to her weight, she said, "I weigh about 143 pounds." When asked if she and John "were very close friends," she answered, "No, I was afraid of him." When asked, "Why did you let him come down there to your home and lay across your bed?" she answered, "I couldn't keep him from coming to my house." When asked, "Why, that afternoon you and Blaney walked from your house down to Meador's whiskey store and bought some whiskey together, didn't you?" she answered, "Yes, sir." She denied drinking any whiskey with him that afternoon, but admitted that she does drink whiskey. She says that John got her by the arm and

made her go down to the whiskey store with him. Referring to John, she said, ''He had been drinking before and when he is drunk he don't know what he is doing half the time.'' Asked as to the location of Meador's whiskey store, she said, ''It is on the corner of College and Main Street in Bowling Green.'' Her husband had filed a divorce suit against her, but it was not pending at the time Blaney was killed.

The court gave the usual instructions on murder, voluntary manslaughter, self defense, and defense of home. The verdict of the jury was: ''We the jury find the defendant guilty of voluntary manslaughter and fix her punishment at five years in the penitentiary.''

Appellant assigns as errors: (1) The court erred in refusing to sustain defendant's motion for a peremptory instruction at the conclusion of plaintiff's testimony, and also at the conclusion of all the testimony; (2) the verdict of the jury is not sustained by the evidence.

Appellant's defense was that she was afraid of Blaney and shot to scare him away. The jury heard the evidence as to her association and conduct with Blaney. They evidently concluded, as they might well have done, that she was not afraid of him. She and Blaney had gone into Bowling Green for whiskey a few hours before he was killed. No one had seen any trouble between them at any time. She apparently was very much infatuated with him. He was lying across her bed when his mother came for him at 6:30 the evening he was killed. She hugged him and held him and would not permit him to go with his mother to his supper. The evidence does not disclose how much of the liquor had been drunk by Blaney or her. From his actions, he had drunk a part of it. She admits that she also drinks liquor, although she denies having drunk any on this occasion. The jury, no doubt, concluded that liquor was largely the cause of this trouble. She stated that Blaney ''had been right there at the door'' and that she ''knew he was out that way.''

On the basis of the testimony which we have summarized, the jury evidently concluded that appellant fired a shotgun blast through her front door in reckless disregard of human life. The testimony, we believe,

was sufficient to take the case to the jury and to sustain the verdict of the jury.

The judgment of the circuit court is affirmed.